Filed 5/13/26  P. v. Martinez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B333722 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA475969) |
| v. | |
| NEFTALY MARTINEZ, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Appellant. | [CHANGE IN JUDGMENT] |

THE COURT:

Good cause appearing, the unpublished opinion filed April 28, 2026, is modified as follows:

> 1.     On the title page, first paragraph under the caption, the second sentence which reads, "Affirmed, in part, reversed in part, and remanded" is

amended to read, "Affirmed, in part, reversed in part, and remanded with directions";

2. On page 2, second paragraph, the first sentence which reads, "We vacate the conviction on count 10 and remand for a retrial", is amended to read, "We vacate the conviction on count 10 and remand for a retrial and direct the court to hold further proceedings to address the unauthorized sentence on count 14 and correct an error in the abstract of judgment";

3. On page 13, the heading, "1. <u>Legal Principles and Standard or Review</u>" is modified to read, "1. <u>Legal Principles and Standard of Review</u>";

4. On page 34, last paragraph, first sentence, the clause "but he but did not attempt to question him about that shooting" is modified to read, "but he did not attempt to question him about that shooting"; and

5. On page 52, first full paragraph, the first sentence and citation are deleted and replaced with, "A trial court must instruct on all lesser included offenses supported by substantial evidence, including voluntary manslaughter. (*People v. Duff* (2014) 58 Cal.4th 527, 561.)"

6. On page 55, the disposition is modified to read as follows: "The conviction on count 10 is

vacated and the matter is remanded to the trial court to allow the prosecution to retry defendant on that count if the prosecution so elects. The court is then directed to resentence defendant and address the unauthorized sentence on count 14 and to ensure that defendant's correct date of birth is reflected on the abstract of judgment".

In all other respects, the judgment of conviction is affirmed. The petition for rehearing is denied. This modification changes the judgment. (Cal. Rules of Court, rule 8.264(c)(2).)

_____

HOFFSTADT, P. J.        BAKER, J.        KIM (D.), J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B333722 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA475969) |
| v. | |
| NEFTALY MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Charlaine F. Olmedo, Judge.  Affirmed, in part, reversed in part, and remanded.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury found defendant Neftaly Martinez guilty of murder, attempted murder, and related offenses in connection with a gang-motivated series of murders in late 2017.  On appeal, he contends the trial court violated his rights under the Fifth and Fourteenth Amendments by admitting his incriminating statements to an undercover informant and under Code of Civil Procedure section 231.7 (section 231.7) in ruling on two objections to peremptory challenges.  He also contests the sufficiency of the evidence on the lying-in-wait and gang special circumstances findings, the gang conspiracy offenses, and the gang enhancements.  And, he maintains the court misinstructed the jury on the elements of gang conspiracy and failed to instruct on self-defense and imperfect self-defense.  Finally, he argues that the sentences imposed on two counts must be modified and the abstract of judgment corrected.

We vacate the conviction on count 10 and remand for a retrial.  We otherwise affirm the judgment.

# II. FACTUAL BACKGROUND

A. *Blythe Street Gang*

Defendant and his brother, codefendant Santos Martinez (Santos), were members of Blythe Street, a criminal street gang in Panorama City, whose rivals included the Columbus Street, Van Nuys, Langdon, and Pacoima gangs.  Codefendants Ezequiel Romo (Romo) and William Benitez (Benitez)[1] were also members

---

[1] Defendant was tried together with Santos, Romo, and Benitez, but he is the only appellant in this appeal.  In Santos's

2

of Blythe Street.  Defendant was known as Solider, Santos as Raider, Romo as Wicked, and Benitez as Smokes.

According to former Blythe Street member witness 2,[2] the gang's members were involved in various types of criminal activity, including drive-by shootings, assaults, extortions, and drugs sales.  In 2015, witness 2 was receiving from Mexico large amounts of drugs—both methamphetamine and heroin—and distributing and selling[3] them to Blythe Street members.  During the period January 1, 2015, through November 5, 2015, he distributed and sold those drugs to gang members five days a week.  Gang members used the money from drug sales to buy guns for protection, pay taxes to the Mexican Mafia, and send money to Blythe Street members in prison.

---

appeal, we affirmed the judgment and that decision is now final. (*People v. Santos Martinez* (Aug. 26, 2025, B331242 [nonpub. opn.].)  We abated Romo's appeal before it was briefed due to his death.

[2]     At the time of trial, witness 2 was incarcerated in a federal facility for possession of crystal methamphetamine.  Prior to trial, he had entered into a leniency agreement in return for his cooperation as a witness for the prosecution.

[3]     Witness 2 explained that he would initially give drugs to members so they could "make money free of charge," but if they wanted more drugs, "they had to pay for it."

B.    *Tagging Murder of Rios* (Counts 1–3)

On October 28, 2017, Carlos Rios was shot multiple times and killed.  A total of 17 shell casings were recovered from the scene.

Witness 1[4] spoke to his mentor Rene Molina, a Blythe Street member, both before and after Rios's murder.  Molina explained that Rios was murdered because he had a "B" tattooed on his face while in jail, without first being "officially jumped in" as a member of Blythe Street.  According to Molina, Blythe Street members devised a plan to drive Rios to another neighborhood in Van Nuys on the pretense that "they were going to tag Blythe" and, "[a]s soon as [Rios] got a little bit distracted and turned his back to do the graffiti," they would shoot him.

Witness 1 also spoke to Santos after the Rios murder and Santos described the shooting as follows:  "[T]hey pulled up to a Van Nuys neighborhood.  They got out of the car.  [Santos] said that [Rios] started graffitiing a little bit.  As soon as [Rios] was doing that, [Santos] took out the gun, emptied the clip on him, but [Rios] didn't die.  [¶]  So [Santos] went back to the car and asked for a gun, and they were like, 'what do you mean he's not dead?  You emptied a clip on him.'  That's when [defendant] got out of the car and finished the job."  Witness 1 also spoke to defendant, who "was just making fun of how [Santos] had emptied a whole clip on him and … couldn't kill him so [defendant] had to do it."

---

[4]    Witness 1, a former Blythe Street member, was charged with murder in connection with a gang-related shooting at a Denny's restaurant—for which defendant was not charged—and subsequently entered into a leniency agreement in return for his cooperation as a witness for the prosecution.

4

On the evening of November 3, 2017, Los Angeles Police Department Officer Joseph Meyers and his partner observed defendant on the street leaning against a car. They searched him and found a 12-round magazine containing six live rounds in his front pocket. When Officer Meyers asked if he had anything else, defendant said he had a "burner" in the car. Officer Meyers's partner searched the car and recovered a firearm from the back seat loaded with a 12-round magazine and readied to fire with a chambered round. A criminalist test-fired the weapon recovered from defendant's car, analyzed the casings recovered near Rios's body, and determined the casings were fired from that weapon.

C. *Wendy's Murder of Saldana* (Count 10)

Rony Martinez (Rony)[5] was a member of the Columbus Street Gang. He was a close friend of Alexis Saldana, an associate of Columbus Street.

On November 17, 2017, sometime between 10:00 p.m. and 10:30 p.m., Rony and Saldana were drinking and driving around Blythe Street territory in a small brown car with two other Columbus Street members, Bryan Portillo and Richard Rangel. Saldana was driving.

Rony and his companions stopped next to a black SUV, exchanged words with its occupants, and then someone in Rony's car threw a beer bottle at the SUV. The SUV began to chase their brown car for about a minute at which point Rony heard gunshots and their car crashed through the east side of a Wendy's restaurant "into the dining area, up towards the front counter."

---

[5] Rony was not related to defendant or Santos.

Following the crash, Portillo and Rangel fled the scene. But Rony stayed with Saldana, who had suffered a single fatal gunshot wound to the back of the head.

Police arrived and arrested Rony who told them that he believed it was Blythe Street gang members in the SUV. They recovered seven .40 caliber casings from the nearby parking lot.

The next day, witness 1 went to Molina's apartment and spoke to him and Santos about the Wendy's shooting. They told witness 1 that they were driving away from Blythe Street territory on Van Nuys Boulevard when they saw some Columbus Street gang members in a car stopped at a red light. People in both cars "started shooting at each other." Molina drove while Santos shot at the Columbus Street car. According to witness 1, Santos and Molina celebrated the shooting.

After he was arrested, Santos told a *Perkins* agent[6] that he and defendant were in contact by "walkie talkie" during the events leading up to the murder of Saldana at the Wendy's. Santos claimed defendant had an automatic rifle with a scope and was near the scene of the shooting. When some Columbus Street members drove into Blythe Street territory shouting "'fuck Burros'"—a derogatory reference to Blythe Street—Santos was talking with defendant. Defendant asked Santos whether he should "take them out," referring to the Columbus Street members, but Santos advised following them instead, and

---

[6] A *Perkins* operation—based on *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*)—is a planned procedure during which investigators place a criminal suspect in a cell with an undercover, or *Perkins*, agent and record their conversations. As explained below, after their arrest, both Santos and defendant made incriminating statements to a *Perkins* agent.

6

defendant agreed.  According to Santos, they then followed the Columbus Street car with other members in "a gang of G rides" and the shooting took place as their rivals' car was entering the Wendy's drive-thru.  When the *Perkins* agent asked Santos whether he shot more than one of the Columbus Street members, Santos replied, "[Defendant] hit a gang of people.  That was him though.  Me and my brother from across the street."

D.      *Burnet Avenue Attempted Murder of Pena* (Counts 13–15)

On the morning of December 8, 2017, Salvador Pena and his cousin Bryan Ortiz were smoking outside an apartment complex located on Burnet Avenue, an area claimed by the Columbus Street gang.  Two Hispanic males wearing bandanas approached and both began firing weapons at Pena as Ortiz stood a few feet away.  Pena, while at a hospital, described the shooting to officers.

Pena was hit and fell to the ground bleeding, and Ortiz immediately began rendering aid.  Pena sustained three gunshot wounds to his torso and one to his leg.  He survived his wounds.

Police responded to the Burnet Avenue scene at approximately 6:55 a.m. and observed bullet holes in the stucco and windows of the apartment building and in a fence inside the complex.  They also recovered approximately twelve .40-caliber casings.

As one of the officers arrived at the scene, he observed Roberto Castillo, a known Columbus Street member, "sticking his head out" from an apartment near the complex on Burnet Avenue.  Castillo jumped out the window and ran from the officer who immediately set up a perimeter.  About an hour later, the officer located Castillo, who had blood on the back of his hands, in

7

an apartment in the Burnet Avenue complex that he shared with his sister. Officers recovered a .38 caliber handgun, a .38 caliber magazine, .45 caliber ammunition, and shotgun rounds.

According to witness 1, Santos told him about the December 8, 2017, attempted murder that occurred on Burnet Avenue that morning. Cynthia Valdez drove Santos and defendant around early that morning looking for Columbus Street gang members. Santos explained that, "[a]t first they couldn't find any, then they found some so they chased them into a building. They were shooting at them. They were shooting at [Santos], and [Neftaly] was shooting at the guy from Columbus. [¶] But after I guess a couple seconds, they started getting shot back …." In the face of the return gunfire, Santos jumped a fence. Defendant, who had dropped his gun, "just left it there" and then also jumped the fence. They ran to Valdez's car and fled the scene.

Surveillance video recovered from a building near the scene of the shooting depicted a Nissan Cube that looked like the car registered to Valdez, traveling southbound that morning on Burnet Avenue. It then showed defendant and Santos exit from the car and walk southbound on Burnet as the Nissan followed. That video later showed defendant and Santos running northbound toward the Nissan. The surveillance video did not depict the shooting.

E.     *The* Perkins *Operation with Santos*

On February 2, 2018, police located and arrested defendant, Santos, and Valdez. On February 5, 2018, at 1:50 p.m., investigators placed Santos in a jail cell with a *Perkins* agent and recorded their conversation. The prosecution played

8

the audio recording at trial and provided a transcript to the jury. We have described the relevant portions of Santos's conversation with the agent in our factual statement above and discuss them further below.

F.  *The* Perkins *Operation with Defendant*

On February 5, 2018, at 5:18 p.m., investigators placed defendant in a jail cell with a *Perkins* agent and recorded their conversation.  The prosecution played the audio recording at trial and provided a transcript to the jury.  We discuss relevant portions of defendant's conversation with the agent in detail below.

G.  *Defendant's Evidence*

A defense gang expert testified that gang members considered the Los Angeles County jail much more dangerous than state prison.  To establish status and protect himself, a young gang member "might say that they know somebody … of high stature when in fact they don't know that person" and might brag to impress an older gang member as a survival mechanism. The expert agreed that, to establish a gang member's status and dissuade others from victimizing him, a young gang member entering a custodial setting, such as the county jail, might claim to have committed crimes when, in fact, he had not committed them.  According to the expert, there was a hierarchy among gang members in a custodial environment, and older members who have spent more time in prison are given more deference than younger, newly incarcerated members.  Finally, the expert

9

confirmed that gang members frequently lie to the police and to other gang members.

## III. PROCEDURAL BACKGROUND

On July 24, 2019, a Los Angeles County grand jury returned a 29-count indictment against eight defendants, including defendant, Santos, Romo, and Benitez. The indictment charged defendant with 13 counts, including murder, attempted murder, gang-conspiracy offenses, and firearm-related offenses. As relevant to this appeal, defendant was charged:

in count 1, along with Santos and Romo, with the October 28, 2017, murder of Rios in violation of section 187, subdivision (a);

in count 2, along with Santos and Romo, with engaging in a criminal street gang conspiracy on October 28, 2017, in violation of section 182.5;

in count 3, with possession of a firearm by a felon on October 28, 2017, in violation of section 29800, subdivision (a)(1);

in count 5, along with Santos, with the November 17, 2017, murder of Saldana in violation of section 187, subdivision (a);

in count 6, along with Santos, with the November 17, 2017, willful, deliberate, and premeditated attempted murder of Rony in violation of sections 664 and 187, subdivision (a);

in count 7, along with Santos, with the November 17, 2017, willful, deliberate, and premeditated attempted murder of Portillo in violation of sections 664 and 187, subdivision (a);

in count 8, along with Santos, with the November 17, 2017, willful, deliberate, and premeditated attempted murder of Rangel in violation of sections 664 and 187, subdivision (a);

in count 9, along with Santos, with shooting at an occupied motor vehicle on November 17, 2017, in violation of section 246;

in count 10, along with Santos and Romo, with engaging in a criminal street gang conspiracy on November 17, 2017, in violation of section 182.5;

in count 11, with possession of a firearm by a felon on November 17, 2017, in violation of section 29800, subdivision (a)(1);

in count 13, along with Santos, with the December 8, 2017, willful, deliberate, and premeditated attempted murder of Pena in violation of sections 664 and 187, subdivision (a);

in count 14, along with Romo and Santos, with engaging in a criminal street gang conspiracy on December 8, 2017, in violation of section 182.5; and

in count 15, with possession of a firearm by a felon on December 8, 2017, in violation of section 29800, subdivision (a)(1).

The indictment alleged the following three special circumstances under section 190.2: as to counts 1 and 5, lying-in-wait within the meaning subdivision (a)(15), and gang-murder within the meaning of subdivision (a)(22); and, as to count 5, multiple-murder within the meaning of subdivision (a)(3).

The indictment further alleged, as to counts 1, 2, 5, 6, 7, 8, 9, 10, 13, and 14, personal use of a firearm and gang-related principal use of a firearm enhancements within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1). The indictment also alleged that counts 1, 3, 5, 6, 7, 8, 9, 11, 13, and 15 were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b). Finally, the indictment alleged that defendant suffered a prior serious or

11

violent felony conviction under the Three Strikes law within the meaning of sections 667, subdivisions (b) through (i) and 1170.12, subdivision (a) through (d).

As noted, defendant was tried together with Santos, Romo, and Benitez. On April 25, 2023, the jury found defendant guilty on counts 1 through 3 (the tagging murder of Rios), 10 (the gang conspiracy count based on the Wendy's murder and attempted murders), and 13 through 15 (the Burnet Avenue attempted murder of Pena), but acquitted him on counts 5 through 9 and 11 (the other counts based on the Wendy's murder and attempted murders).

As to count 1, the jury found the murder was in the first degree and the lying-in-wait and gang-murder special circumstances were true. As to counts 1, 2, 13, and 14, the jury also found that the personal use of a firearm allegations were true.

On June 26, 2023, the trial court held a bench trial on the strike allegation and found it true. On June 30, 2023, the court held a bench trial on the gang and gang-related principal use of a firearm allegations and found true the gang enhancements as to counts 1, 3, 13, and 15 and the gang-related firearm enhancements as to counts 13 and 14.

The trial court sentenced defendant to life without the possibility of parole, plus consecutive terms of 125 years-to-life, and life with parole ineligibility of 30 years.

Defendant filed a timely notice of appeal.

## IV. DISCUSSION

### A. *Peremptory Challenges*[7]

Defendant challenges two voir dire rulings made under section 231.7, one sustaining an objection by the prosecutor and another overruling a defense objection.

#### 1. Legal Principles and Standard or Review

"The Legislature enacted section 231.7, effective in criminal trials beginning January 1, 2022, to establish 'a new process for identifying unlawful bias in the use of peremptory challenges during jury selection' because studies showed that the existing *Batson/Wheeler*[8] analysis … was inadequate to prevent racial discrimination…. Discrimination in violation of this section need not be purposeful, but may involve 'unconscious bias,' which 'includes implicit and institutional biases.'" (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 539–540 (*Jimenez*).)

Section 231.7 prohibits the "use [of] a peremptory challenge to remove a prospective juror on the basis of the prospective

---

7    Defendant challenges the two rulings by "join[ing] in and adopt[ing]" the arguments made by Santos in his opening, supplemental, and reply briefs in his appeal from the same two rulings (case number B331242). Because he makes no arguments other than those which we rejected in our unpublished opinion in Santos's appeal, we adopt here the background, analysis, and disposition of those contentions. (*People v. Santos Martinez, supra*, B331242.)

8    *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

juror's [actual or perceived] race," as well as six other protected groups.  (§ 231.7, subds. (a), (i).)  Once an objection to a peremptory challenge is made, the party exercising the challenge must "state the reasons the peremptory challenge has been exercised."  (*Id.*, subd. (c).)  The court shall then "evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances.  …  If the court determines there is a substantial likelihood that an objectively reasonable person would view race … or perceived [race] as a factor in the use of the peremptory challenge, then the objection shall be sustained.  The court need not find purposeful discrimination to sustain the objection."  (*Id.*, subd. (d)(1).)

"Section 231.7, subdivision (j), provides:  'The *denial* of an objection made under this section shall be reviewed by the appellate court de novo, with the trial court's express factual findings reviewed for substantial evidence.'  (Italics added.)  The statute does not set forth a standard of review for a trial court's decision to *sustain* a section 231.7 objection ….  Nonetheless, applying traditional principles of appellate review, we determine that the sustaining of a section 231.7 objection is also reviewed de novo, deferring to the trial court's factual findings if supported by substantial evidence."  (*People v. Hinojos* (2025) 110 Cal.App.5th 524, 541–542, fn. omitted (*Hinojos*).)

### 2. Peremptory Challenge to Juror No. 151

Defendant contends the trial court erred when it sustained the prosecutor's objection under section 231.7 to his peremptory challenge to juror no. 151[9].

#### a. Background

##### i. Juror No. 151

During voir dire by the trial court, juror no. 151, an Asian female, provided the following information. She worked as a juvenile probation officer in a juvenile facility. She had been a probation officer for six or seven years. Her duties at the facility focused on "safety and security" and included enforcement of the facility's disciplinary rules. If a rules violation was "significant", she would "do write-ups."

As part of her duties, juror no. 151 dealt with juvenile gang members. As she explained: "We have a lot of gang members in the facility, but … I don't allow the kids to really gang-bang or talk about it if they[ are] there for rehabilitation." Juror no. 151 said that she could be fair to both sides. She also believed she could "judge a police officer using the same standard [she] would [use with] any other witness."

---

[9] As we explain below, the objection to the peremptory challenge to juror no. 151 was sustained and the juror was empaneled as a juror. We therefore refer to this juror as such. We will use the term "prospective juror" when referring to a juror who was excused from the panel based on the exercise of a peremptory challenge or when referring to the larger group of potential jurors.

Later in the selection process, the prosecutor explained to the prospective jurors that the law allows a police officer to use a ruse or a trick and asked jurors if any of them would "automatically dismiss evidence that was obtained through a ruse or trick by law enforcement?" He then asked juror no. 151 whether she had used a ruse in her job, and she said, "Yes." The prosecutor followed up by asking her whether she had a problem with using a ruse, and she said, "I don't have a problem."

After further follow-up questions to other prospective jurors, the prosecutor returned to juror no. 151 and asked, "How have you used a ruse or trick or deception, whatever you want to call it?" She replied: "I would kind of describe it as manipulating it a little bit to kind of get someone to be honest … I work with juveniles, so it's a little different. It's like … I told one youth … [I would] ask her one time and if she doesn't tell me the truth or if it goes this way or that way, then I'm going to have to call the super[visor], this is going to happen and all that. [¶] And then because of that, she was like, 'Okay, fine.' … I have done that to that kid, but it wasn't going to really be like that." In response, the prosecutor queried, "You were never going to call the supervisor," and juror no. 151 clarified, "No."

ii.     Prospective Juror No. 191

Prospective juror no. 191 was an Asian male who worked for a startup company that conducted virtual inspections of cell phone towers and provided analysis of the resulting data for clients. He had served as a juror on a murder trial 10 years prior. Asked by the trial court if he could judge a police officer under the same standard as any other witness, he said, "I think I might slightly favor police," but he agreed with the court that

16

"there is good and bad in every job." He also confirmed that, if instructed to do so, he would judge a police officer under the same standard as any other witness.

While questioning another prospective juror, Benitez's counsel asked if "see[ing] … three crying moms" in a courtroom would influence that juror's decision. Counsel then told the prospective jurors they must put sympathy aside, and asked those who could not follow that principle to raise their hands. Prospective juror no. 191 raised his hand, explaining, "Without knowing all the facts, I mean, it's hard for me to say exactly where I draw the line. But I think if details are really horrible or if things were really bad, I'm not sure—I might have some sympathy for people." Counsel followed up by asking, "Are you going to be able to put aside your sympathetic feelings and listen to the rest of the evidence and testimony presented, or are you going to feel like you're so overwhelmed with emotion that you might just stop listening and you make up your mind, basically?" Prospective juror no. 191 replied, "I think it would be hard for me to say. I would try to do my best to be objective, but, you know …."

### iii. Prospective Juror No. 160

Prospective juror no. 160, an Asian female, was a registered nurse. In response to a juror questionnaire that asked, "Prior jury experience where you were actually selected to listen to evidence. Was the case civil or criminal? Did you reach a verdict or was it a hung jury, mistrial or settled in the middle of the case (**do not indicate what the verdict was or which way you voted**)?" the juror responded: "DON'T REMEMBER. VERDICT REACHED." Referring to the prospective juror's questionnaire

17

responses, the trial court asked, "You were on a trial once, but you don't remember what the case was about or whether a verdict was reached?"  Prospective juror no. 160 responded that she believed it was a murder case and "[p]robably five to ten years ago.  She confirmed she could be fair and impartial to both sides.

Benitez's counsel asked prospective juror no. 160 for her thoughts on a defendant exercising his right not to testify, and she replied, "I wouldn't hold that against them.  I would just listen to what they have to offer and what the evidence is."  Counsel followed up by asking the juror, if she was a defendant with nothing to hide, whether she would testify.  She responded, "I'm no legal expert, so I'd likely defer to my counsel.  But I couldn't hold—"

#### iv.     Peremptory challenges

During a subsequent sidebar conference, the trial court observed that there were no challenges for cause that needed to be heard and therefore indicated that the attorneys should make their peremptory challenges.  Defense counsel proceeded to jointly exercise three peremptory challenges to prospective juror nos. 191 (an Asian male), 16, and 160 (an Asian female), following which they informed the court that they had no further joint challenges.  Counsel for Romo, Santos, and defendant then accepted the jury as constituted, but counsel for Benitez exercised an individual challenge to prospective juror no. 161.

At that point, defense counsel conferred and informed the trial court that they now had a joint challenge to juror no. 151.  The prosecutor objected to the challenge, and the court called a sidebar conference.

18

During the conference, the prosecutor confirmed that he was making the objection pursuant to section 231.7 and explained as follows:  "My basis is on the basis of race.  There have been … three Asian jurors kicked off by the defense out [of] a total of five."  The prosecutor also noted that his cocounsel was an Asian female.

The trial court agreed with the prosecutor's statement that three of the defense's five peremptory challenges had been exercised against Asian jurors.  Romo's counsel then proffered defendants' race-neutral reasons for the joint challenge to juror no. 151, explaining, "Your Honor, the non-race-based reasons are that she has associations with lots of gang members at her job.  She is a juvenile probation officer in a delinquency facility, which means there are people in that facility that are locked up because they are wards of the court.  [¶]  She deals with safety and security and rehabilitation.  During her questioning by [the prosecutor], during the attorney conducted voir dire, she approved of using a ruse, approved of lying and also said that she uses ruses as well and she thinks that those worked out well.  [¶]  So I think that she has got some issues not related to her race, and so those are the reasons that I had, at least, for feeling that way.  …  [J]ust so the record is clear … and the court knows this, a probation officer in a juvenile proceeding, they have roles of being the actual courtroom security in the courtrooms.  [¶]  The probation department administers the juvenile camps and also the juvenile detention facilities in [Los Angeles] County.  As such, they are actually part of the prosecution.  They have constant contact with peace officers.  [¶]  And she's been there for six or seven years."

As to juror no. 151, Santos's counsel further asserted, "I'd just add that, Your Honor … has indicated that the court is tentatively inclined to allow [Santos's] *Perkins* statement to be used. There was a ruse used in that [operation]. My client was 18. That's an added factor. [¶] We have someone who deals with … juvenile gang members and uses ruses in her employment."

Romo's counsel then addressed defendants' reasons for challenging prospective juror no. 160, explaining, "There are a couple issues I had with [prospective juror no.] 160. One is that she was on a murder case and she does not remember the verdict that was reached. … [T]hat is significant for a couple of reasons. [¶] One is it showed that she perhaps either has faulty memory or it didn't impact her enough. A juror and the juries are given instructions including you should have an abiding conviction of the truth of the charge, and an abiding conviction is something that stays with you and is not fleeting. [¶] Sitting on a murder trial, I think, is a significant thing for most citizens. So the fact she does not recall the verdict means she either was not being truthful or it just didn't have enough impact on her. [¶] Also, Your Honor, in regard to her answer to some questions on the second page of the questionnaire, which would be questions [nos]. 16, 17, and 18, she said she was 'in between.' Regarding whether she could be fair or not she said, 'more so yes.'"

Romo's counsel next addressed the reasons for challenging prospective juror no. 191, adopting the comments about that juror made earlier by Santos's counsel. Defendant's counsel then added, "[prospective juror no. 191] was going to favor police officers. He also indicated he would have sympathy [for] the victims and, most prominently, he was going to believe police officer testimony." Benitez's counsel stated that, "under

questioning regarding sympathy, [prospective juror no. 191] did indicate that he would have a difficult time overcoming mothers in the audience crying, Your Honor, and it would—he would try. [¶] He would try to evaluate evidence, but it would deeply impact his ability to evaluate the evidence without a bias."

The prosecutor responded to defense counsels' explanations, stating, "Your Honor, all three jurors said they could be fair. [Prospective juror no.] 160 remembered her verdict during voir dire, not in the questionnaire. I'm sorry. In the questionnaire she said a verdict was reached, and then she also clarified that the verdict was five to ten years ago. [¶] So I think what [Romo's counsel] is referring to in … the actual questionnaire she says, 'Don't remember. Verdict reached.' She stated on the record that she reached a verdict, so I don't think she's being cavalier about her duties as a juror. [¶] I'd also note that in terms of [juror no.] 151, every single juror … that remains said that they would accept a ruse and would not automatically dismiss a ruse. [¶] And the ruse that [juror no.] 151 used was that she said she was going to call her supervisor, and that was the ruse. It was something extremely minor in this particular case. [¶] … [W]hen she talks about the wards in her custody, she talks about kids. When she refers to the gang member, she doesn't refer to them in any derogatory fashion. [¶] She says she likes to bring activities for the kids and … from every indication, she sounds more like she is part of a rehabilitative effort in terms of the wards in her custody, not that she is acting as a law enforcement officer. [¶] All three have said they could be fair, and … that's three out of the five people that were excused."

Following the explanations by counsel, the trial court sustained the prosecutor's objection under section 231.7,

21

reasoning as follows: "The court does find by clear and convincing evidence that the peremptories are being used on a racial basis. One of the factors that [section 231.7] says to look at … is whether or not the reasons you're giving were also set forth by other jurors and you're not exercising the peremptories on other jurors. [¶] There were a number of jurors who didn't remember their verdicts. There were a number of jurors who indicated that they were okay with ruses. The reason why I brought up the parent example is because saying 'I'm going to call my supervisor' is akin to 'I'm going to tell your dad when he gets home.' [¶] The ruse was not anything of a deceptive nature like falsifying print cards or something of that nature. And most telling to this court is the fact that this juror was accepted by all counsel and then subsequently now being excluded. [¶] So obviously, those factors that concern counsel that are being stated on the record didn't—the dynamics don't change, necessarily, that. Whether or not she accepts ruses or … used ruses[,] her job[,] her exposure to … juveniles in the delinquency system. [¶] All of that existed when you accepted her. There was nothing new about a juror being placed in the box that replaces many of the things you're now telling the court you're concerned about. The court will reseat her."

      b.    Analysis

Under section 231.7, once the prosecution objected to the peremptory challenge to juror no. 151, claiming race was a motivating factor, defendants had the burden, under the statute's objective standard, of showing that race was not a factor in defendants' joint exercise of a challenge. According to defendant, the reasons for the challenge proffered by Santos's counsel

22

demonstrated that there was no substantial likelihood[10] that an objectively reasonable person would view race as a factor in defense counsels' decision to excuse juror no. 151. We disagree.

In explaining his rationale for the challenge, Santos's counsel cited three reasons unrelated to race: juror no. 151 worked in law enforcement as a juvenile probation officer at a delinquency facility; she had frequent contact with juvenile gang members; and she approved of the use of ruses and had employed them in the course of her work, experience that counsel argued was relevant to defendant's statements to the *Perkins* agent.

The trial court, however, did not find the proffered explanations credible because defendants had exercised three of their first five peremptory challenges on Asian jurors; counsel had initially accepted juror no. 151; counsel had accepted other non-Asian jurors who had approved of the use of ruses; and the ruse the juror described using with a juvenile was unlike the more deceptive ruses employed during defendant's *Perkins* operation.

Substantial evidence supported the trial court's factual findings. The majority of defendants' peremptory challenges up to that point—60 percent—were exercised against Asian jurors, a fact that supported an inference of actual or perceived bias against that group. Further, defendant initially accepted juror no. 151 but then, together with the other defendants, jointly

---

[10] "'[S]ubstantial likelihood'" means "more than a mere possibility but less than a standard of more likely than not." (§ 231.7, subd. (d)(2)(B).) An "objectively reasonable person" is defined as one who is "aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (*Id*., subd. (d)(2)(A).)

23

challenged her, even though no new information about her had been provided. Moreover, other prospective jurors also said that they approved of the use of ruses, but were not challenged.[11] And, the one ruse that juror no. 151 recalled using involved a relatively innocuous threat to notify a supervisor if a juvenile ward did not provide an honest response to the juror's inquiry about an undisclosed disciplinary matter. As the court noted, that disciplinary tactic bore little resemblance to the *Perkins* operation used on defendant during the murder investigation and therefore called into question the genuineness of the proffered reason for the challenge.

We therefore agree with the trial court that "in light of the totality of the circumstances," there was "more than a mere possibility" that "an objectively reasonable person would view race [or perceived race] … as a factor in the use of the peremptory challenge …." (§ 231.7, subd.(d)(1) & (2)(B); see *Hinojos*, *supra*, 110 Cal.App.5th at pp. 544–545 [Section 231.7 is "concerned with the likelihood the peremptory challenge could be viewed as motivated by an improper ground (i.e., a legal standard) rather than whether the peremptory challenge actually was motivated by an improper ground (i.e., a factual question)"].)

---

[11] Several other prospective jurors said they would accept the use of ruses by law enforcement, including prospective juror nos. 151, 154, 161, 167, 228, 231, 258, and 298. Of those, only juror no. 151 was identified as Asian and, as noted, defendants exercised a peremptory as to her.

### 3. Peremptory Challenge to Prospective Juror No. 46

Defendant next contends that the trial court erred by overruling the joint objection under section 231.7 to Benitez's challenge to prospective juror no. 46.

#### a. Background

During the trial court's questioning of the prospective jurors based on their answers to the juror questionnaire, prospective juror no. 46[12] provided the following responses. He was retired from two previous jobs with a utility company and a hospital. He had served on juries that reached verdicts, including a criminal murder trial 40 years prior and a civil trial 25 years prior. One of his brothers spent time in prison for drug sales 40 years ago. But he did not believe that fact would affect his ability to be fair. His other brother was a director of youth gang services for Los Angeles County for many years, but had been retired for about 20 years. According to prospective juror no. 46, the "only thing that [he could] actually say about [his brother's job as the director was] that [his] mother wanted [his brother] to send [him] to camp so [he] wouldn't get married." He believed his brother's employment would not impact his ability to be fair and impartial.

During his questioning of the prospective jurors, Santos's counsel asked prospective juror no. 46 whether he dealt with gangs as part of his work, and he answered, "No." Counsel then inquired if prospective juror no. 46's "preliminarily [*sic*] source of information" about gangs was from "[w]hat [he saw] on [television], what [he] read in the newspaper[,] or [experiences he

---

[12] Prospective juror no. 46 was a Latino male.

had] growing up?" Prospective juror no. 46 replied, "[a]ll of the above" and then reiterated that one of his brothers was a director of youth gang services for the county for many years. In response, counsel asked whether his brother spoke with him about his job, and prospective juror no. 46 replied, "Very seldom. We … were kind of going separate paths of careers. Every once in a while when [we] would get together, he would say something about it." But he agreed that, based on his conversations with his brother, gang members were "human beings, they [were] individuals, too, and there [were] differences in character and personality and life experiences, things of that … sort."

During his questioning, Benitez's counsel asked whether prospective juror no. 46 knew why he was the last attorney to question him. Prospective juror no. 46 responded, "Because the other three [defense attorneys] went before you," to which counsel replied, "That's a great answer. [¶] … [¶] I'm not going last because they're saving the best for last, because the other three defense counsel—we have an amazing defense team. The reason I'm going last simply is because the judge said, 'Here's the order you're going,' so I'm going last. [¶] But I bring this up because sometimes when … the fourth attorney is questioning the same … the same witness, people might tune out or you might be tired by the end of the day or whatever." Beyond that exchange, Benitez's counsel did not ask prospective juror no. 46 any further questions.

Later in the proceedings, Benitez's counsel exercised a peremptory challenge to prospective juror no. 46, and Romo's counsel raised a joint objection on behalf of the other defendants to the challenge under section 231.7. The trial court called for a

side bar conference, at which point the prosecutor joined in the objection.

During the conference, the trial court observed that prospective juror no. 46 was an older Latino male and the first Latino to be excused. Santos's counsel then pointed out that the prospective juror's brother had been in prison, he had previously been a juror on a murder case that went to verdict, and he had another brother who "worked in administration with gangs; [he] discussed gangs with him"; and he had answered "yes to [question nos.] 16, 17, and 18" on the questionnaire. The court responded, "I understand you may want this juror for a variety of reasons, but on what basis do you believe it's race-based?" Santos's counsel replied, "Because, first of all, there is a possibility of Hispanics on the jury and—and we felt there was no justification for his excusal."

Defendant's counsel added, "[T]here was really no other reason than race because there is this man who said he could be fair a multitude of times when questioned by all counsel"; defendant's counsel followed up with the observation that "the defendants are all Hispanic"; and the prosecutor joined in the argument of defendant's counsel.

The trial court then asked Benitez's counsel to explain the basis for the challenge. Counsel responded, "I believe that the fact that his brother works so closely with gangs might have cemented his opinions on gang members, and I don't believe that he can be fair to the defendants. [¶] In terms of race, Your Honor, I can't even tell what race he is based on looking at him or hearing him regarding his accent or appearance."

The trial court noted that none of the presumptions of invalidity under section 231.7, subdivision (e)(1) seemed to apply.

In response, the prosecutor said, "There [are] various sections …
within the code that apply, having a close relationship with the
people who have been stopped, arrested, or convicted of a crime.
That sounds like one of the reasons why [he was challenged.]"

The trial court overruled the objection, explaining: "I think
[Benitez's counsel] says because he works with gang members,
not because the brother was arrested or convicted. So I find that
that is not necessarily race-based, and it's an exercise of a
peremptory even if other counsel don't agree with it. So the court
will go ahead and excuse that juror and seat another juror."

### b. Analysis

Defendant initially suggests that the substantial evidence
standard does not apply to our review of the trial court's ruling
because the court did not make any express factual findings in
support of its ruling accepting the explanation proffered by
Benitez's counsel.[13] In ruling on the joint objection to the
challenge, the court expressly found that the explanation
provided by counsel was "not necessarily race-based"[14], and

---

[13]    Defendant also suggests that the reason proffered by
Benitez's counsel was presumptively invalid under section 231.7,
subdivision (e). But he fails adequately to explain how the
proffered reason is covered by one of the 13 presumptively invalid
reasons set forth in subdivision (e). We therefore reject the
assertion.

[14]    Section 231.7, subdivision (d)(1) provides that "[t]he court
shall explain the reasons for its ruling on the record."
Subdivision (j) provides that, in reviewing a trial court ruling on
an objection under section 231.7, "[t]he appellate court shall not

therefore accepted it as a credible rationale "unrelated to a prospective juror's race" which bears "on the prospective juror's ability to be fair and impartial in the case." (§ 231.7, subdivision (e).) We therefore review that determination for substantial evidence. (*Id*., subd. (j).)

According to defendant, the following three factors show that the challenge violated section 231.7: (1) defendant and the prospective juror were members of the same cognizable group; (2) Benitez's counsel failed to question the juror about whether his brother's work with gang members would influence his decision-making in the case; and (3) the record does not support the explanation proffered by Benitez's counsel for the challenge. Based on those factors, defendant concludes that "[t]here was 'a substantial likelihood that an objectively reasonable person would view race … as a factor in the use of the peremptory challenge' to [prospective] [j]uror [n]o. 46." We address each factor.

As to defendant and prospective juror no. 46 being part of the same cognizable group, although section 231.7, subdivision (d)(3)(B) permits the trial court to consider whether "race [or] ethnicity … bear on the facts of the case to be tried," being a member of the same cognizable group as a defendant is only one factor to be considered and, alone, is not especially probative in this case.

Benitez's counsel did not, as defendant notes, question prospective juror no. 46 about his brother's work experience with gang members. But Benitez's counsel was the last defense

---

impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record."

attorney to question jurors.  By that point in the proceedings, he already had heard answers from prospective juror no. 46 supporting an inference that the brother's work with gangs was a source of specific information about them, beyond other generally available sources, and that the juror's access to such information over the years could have an impact on his ability to be fair and impartial.  Thus, there was no need for counsel to question him further about the brother's work or specific opinions he may have formed as counsel was exercising a peremptory challenge.  This is not a case like *Hinojos*, *supra*, 110 Cal.App.5th 524, in which the defense counsel admitted that he had not questioned the juror about his gang views, but nevertheless excused him based on purported concerns about those views.  (*Id*. at pp. 537–538; see also *Wheeler*, *supra*, 22 Cal.3d at p. 281 ["failure … to engage … jurors in more than desultory voir dire, or indeed to ask them any questions at all" can be inferential evidence that the peremptory challenge is motivated by improper bias].)

The record showed that prospective juror no. 46 had a brother who retired after serving as the director of youth gang services in Los Angeles County "for many years."  The record also showed that the juror had occasionally spoken to his brother about his gang-related work over the years.  And, it further revealed that, when Santos's counsel asked the juror about the sources of his knowledge about gang members, he made a point of reminding counsel that the brother worked with gang members for many years.  The record therefore supported a reasonable inference that Benitez's counsel's concern about the brother's work experience with gangs, and its potential impact on prospective juror no. 46's impartiality, was legitimate and not pretextual.  (See *Hinojos*, *supra*, 110 Cal.App.5th at p. 543 [The

totality of the circumstances inquiry "focuses on the nature of the case, the parties, and—importantly—the voir dire proceedings. Because the trial court is in the best position to gather historical facts and to assess credibility based on tone, demeanor, and conduct during voir dire proceedings, we defer to its findings if supported by substantial evidence"].)

Finally, unlike the context in which defense counsel sought to excuse juror no. 151—which showed a disproportional use of peremptories against Asian jurors—prospective juror no. 46 was the first Latino to be excused by any attorney during the selection process. (See § 231.7, subd. (d)(3)(G) [providing that, among other factors, the trial court should consider whether the attorney exercising the challenge "has used peremptory challenges disproportionately against a given race … in the present case"].) Accordingly, the trial court did not err when it overruled defendant's objection to Benitez's exercise of a peremptory challenge.[15]

## B.     *Defendant's Statements to* Perkins *Agent*

We next consider defendant's contention that the trial court's ruling allowing the admission of his audio-taped statements to the *Perkins* agent violated his Fifth Amendment privilege against self-incrimination and Fourteenth Amendment right to a fair trial.

---

[15]     Having rejected defendant's section 231.7 argument, and seeing no other basis on which a *Batson* challenge could be meritorious, we also reject his contention that the court's ruling violated *Batson/Wheeler*. (*Jimenez*, *supra*, 99 Cal.App.5th at p. 548; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 807–808.)

1.    Background

     a.    Defendant's Statements

As explained, three days after he was arrested, investigators placed defendant in a jail cell with a *Perkins* agent and recorded their conversation.[16] At the beginning of the conversation, defendant told the *Perkins* agent that he was known as Soldier from Blythe Street, and the agent replied that he was Listo or Nesio from South Central. Defendant asked the agent if he had seen his younger brother, Raider from Blythe, and when the agent said no, defendant complained that he and his brother had been in jail for the last four days, arrested for murder. Defendant also told the *Perkins* agent that they had been arrested with a female and expressed concern she might cooperate with investigators.

According to defendant, at the time of his arrest, he did not know the reason, claiming, "So much bullshit that we've been doing that I'm, like, which one is it? I told my brother, like, which one, you know?" He added, "There's a lot. But a lot going on in Panorama." Defendant also suggested that he and his brother were not responsible, saying, "Bullshit, fool. Murders being committed, not even by us, fool. Like, residents trying to kill each other and shit, you know? Like, damn, these [racial

---

[16] The record of defendant's *Perkins* operation does not show whether he had been advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) prior to the beginning of the operation. But, as explained below, in his motion to exclude his *Perkins* statements, defendant relied on Santos's motion to exclude which specifically argued that his operation violated *Miranda*.

32

slur] is killing each other. … [¶] … [¶] [The police] think we're doing everything, and we're just sitting there sitting back, like, kicking it, you know?"

Defendant next explained that prior to his current arrest, he had been arrested for violating his parole, bailed out, and on the run. He claimed he "would only come out to shoot [racial slur]."

Later in the conversation, the *Perkins* agent asked, "Who's nuttier, fool, you or your brother?" Defendant responded, "[M]y brother. [¶] … [¶] Yeah. That fool's younger than me. He's 18. [¶] … [¶] That fool's a nut." Defendant went on to describe the competitive nature of their relationship: "Yeah. We kind of, like, compete, fool. Like the homies … even tell us, like, you fools think this is a competition. This is not a competition, dawg. This shit's real. Like, no. This is a game, dawg. Me and my brother are stupid, that's why. I'll come … back from a fuckin' job. [¶] … [¶] I'll be, like, I got two [racial slur]. My brother will be, like, I got three, dawg. [¶] … [¶] I'll be, like, what the fuck? So I'll get back in the car. I'll be, like, say no more. I'll be back right now." According to defendant, "the homies got mad" at them because they were "bringing so much attention to the hood …. They're arresting all … these homies, and it's not even them, you know? Like, they're … just getting arrested for bullshit."

Defendant also described the origins of the recent "war" with Columbus Street. He said it began when Columbus Street members came to Blythe Street territory and shot a homie "in front of his job." According to defendant, "we went to their hood, fool, and we started like … let these fools have it, and they couldn't handle it, fool. So they started crying to the homies, like the big homies. Like, fuck that, you [racial slur] started this shit

33

so now you're going to have a green light.  [¶]  …  [¶]  [W]e could go to their hood whenever we want, you know?  But they can't do shit; they can't come to our hood."

At that point in the conversation, Los Angeles Police Department Detective Gabriel Bucknell came to the cell to explain to defendant why he was arrested, but told defendant, "You don't have to say anything.  I'm not asking you anything, but I'm explaining to you why you're here … is because you're being investigated for that case, okay?"  When advised that he was suspected of murdering Rios, defendant denied knowing him. He also denied knowledge of "a few other homicides" in which the detective said he was a suspect.

When Detective Bucknell left, the *Perkins* agent inquired about the photo the detective showed defendant.  He replied, "Some fuckin' vato that [the detective] said that I killed," claiming, "I don't know that fool."  The agent also asked whether defendant was concerned that the detectives would "hit your brother with the same shit," and defendant responded, "Well, he's my crimey so they're going to probably ask him the same shit" about all of the murders.  Defendant, however, clarified that they had not "done most of them together," insisting that "[e]verything [they] did, [they] did it separate."

After further conversation between defendant and the *Perkins* agent, another officer, Detective Gutierrez, came to the cell, advised defendant that he would also be charged with the Wendy's shooting, and requested a DNA sample; but he but did not attempt to question him about that shooting.  When that detective left, the *Perkins* agent asked, "And the Wendy's what— he said that the car crashed, huh?  Defendant replied, "Yeah. (Inaudible) they crashed into the Wendy's."  The agent then

34

asked if two people inside the car died, and defendant responded, "Yeah." The agent remarked that it must be difficult to hit a moving vehicle and asked where the people in the car were from. Defendant said they were from Columbus Street and agreed that they must have been "caught slipping." The agent commented, "Motherfuckers gangbanging with no guns. I'll be damned if I get killed and I'm holding a gun, you know?" Defendant agreed, "It's fuckin' embarrassing."

Later in their conversation, the *Perkins* agent asked defendant whether he thought he prevailed in the competition with Santos, and defendant conceded that Santos won. He believed Santos was "trying to impress everybody … the whole hood" and that he had succeeded, but complained that "at the end of the day, what the fuck does that matter? The homies ain't doing shit."

At the end of the conversation, the *Perkins* agent returned to the topic of the Wendy's incident, asking, "So you looking at three then, fool. The two in Wendy's and your homie [Rios], huh?" But defendant replied, "Nah. I didn't—I didn't do the one at Wendy's. [¶] … [¶] … I just know about it because I live right next to it."

2.    Motion in Limine

In his trial brief, defendant requested that the trial court exclude the statements he made during the *Perkins* operation. He objected to their admission on "[Evidence Code section] 352 relevance grounds, hearsay, and foundation." He also cited to *Perkins*, *supra*, 496 U.S. 292 and argued that his statements were the product of coercion because the *Perkins* agent "was significantly older than him ([defendant] was just 20 at the time

35

and the agent was between 30–50 years old), was taller, . . . heavier[,]" and likely a gang member.[17]  Finally, defendant relied on "the extensive case law cited by Santos … in his motion to exclude his *Perkins* statement regarding voluntariness and psychologically coercive environments."[18]

The prosecution opposed the requests to exclude, and following a hearing, the trial court denied them.

### 3. Legal Principles

#### a. *Miranda*

"To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any

---

[17]  The *Perkins* agent was between 30 and 50 years old, weighed between 180 and 230 pounds, and was between five feet eight inches and six feet one inch tall.

[18]  On July 14, 2025, defendant filed a request for judicial notice of the record in Santos's appeal which included a copy of Santos's motion to exclude his statements to the *Perkins* agent. We grant that request.

In his motion, Santos contended that his statements were obtained without advising him of his rights under *Miranda*, *supra*, 384 U.S. 436, his statements were involuntary because he faced a credible threat of violence, and his *Perkins* operation was psychologically coercive.

custodial interrogation (*id*. at pp. 444–445).” (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339.)

“In *Perkins,* the United States Supreme Court held that a conversation between an incarcerated suspect and an undercover agent posing as a fellow inmate did not implicate the concerns underlying *Miranda.* The court’s ruling was clearly articulated: ‘We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect’s fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect’s will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist….’ (… *Perkins*, *supra*, 496 U.S. at p. 297.)” (*People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1539–1540.)

### b. Voluntariness

Under the due process clause of the Fourteenth Amendment, “‘[a] statement is involuntary if it is not the product of “‘a rational intellect and free will.’” [Citation.] The test for determining whether a confession is voluntary is whether the defendant’s “will was overborne at the time he confessed.” [Citation.] ‘“The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were “such as to overbear petitioner’s will to resist and bring about confessions not freely self-determined.” [Citation.]’ [Citation.] In determining whether or not an accused’s will was overborne, ‘an examination must be made of “all the surrounding circumstances—both the

37

characteristics of the accused and the details of the interrogation." [Citation.]' [Citation.]" [Citation.]' [Citation.]

"'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.]'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346–347.)

### 4. Analysis

#### a. *Miranda*

Defendant contends that the admission of his statements to the *Perkins* agent violated his Fifth Amendment privilege against self-incrimination. According to defendant, "[t]he 67[-]page transcript of the *Perkins* operation reflects that the lengthy conversation between the agent and [defendant] was led by the agent. Unlike *Perkins*, where there were no interventions by officers, in [defendant's] case two stimulations took place—first by [Detective] Bucknell, and later by [Detective] Gutierrez."

We disagree with defendant's description of the detectives' interaction with him. Although detectives visited the cell twice at different points of the operation, they did not attempt to question defendant. Instead, during the first visit, Detective Bucknell informed defendant that he was being investigated for the Rios murder but made it clear he was not going to question him until later. And, during the second interaction, Detective Gutierrez informed defendant he was a suspect in the Wendy's murder but did not ask him for any information about it. The

38

detectives' brief involvement in the operation did not create an atmosphere in which defendant could have believed he was being interrogated by law enforcement. To the contrary, the transcript reflects that, during the entirety of his conversation with the agent, defendant believed he was speaking with an older gang member, a fact defendant does not dispute. Absent facts showing a police interrogation, the officers were not required to deliver *Miranda* warnings. (*People v. Williams* (1988) 44 Cal.3d 1127, 1142.)

Defendant also complains that he was placed alone in a cell with a physically larger, much older and experienced gang member who persisted in questioning him about the murders when he was "'nodding out'" and "'tired,'" suggesting that such an intimidating atmosphere was sufficiently coercive to trigger the Fifth Amendment protections of *Miranda*. But, as explained, *Miranda* was specifically concerned with formal custodial interrogations and the attendant risk that such an environment would weaken or overcome a suspect's will. Because the agent here acted as a fellow gang member, and not a police officer or detective, neither the size and age disparities between the agent and defendant nor the agent's questioning of defendant while he was fatigued were sufficient to implicate the concerns underlying *Miranda*.

b. Voluntariness

We also reject defendant's related contention that his statements during the *Perkins* operation were coerced and involuntary in violation of his due process rights. According to defendant, he "was psychologically coerced by [Detective] Bucknell informing him he was a suspect in multiple murders,

39

and later by [Detective] Gutierrez informing him that a murder charge was being added for the Wendy's incident.  [His] incriminating statements related to the charged offenses occurred *after* one or both of these stimulations, and thus they were the product of the detectives' coercive influence, regardless of the fact that they were not in the immediate presence of [defendant] at the time of his statements."

Defendant spoke openly with the *Perkins* agent about subjects unrelated to the murders, including his gang membership and moniker, parole status, subsequent arrest for a parole violation, release on bail, and relationship with his younger brother Santos which suggested he was comfortable being with the agent and not intimidated by him.  And, the transcript does not show that the agent ever used threats or other forms of intimidation to induce defendant to speak about the murders.  To the contrary, defendant spoke freely about them and included details without prompting.  Thus, the record supports a finding that defendant spoke to the agent and confided incriminating information, not because the detectives' visits informing him of the charges prompted the disclosures, but because he believed he was speaking to a trustworthy fellow gang member.

Defendant also maintains that the detectives' two visits to his cell informing him of the charges and advising he would be questioned about them shortly supported an inference that his subsequent statements to the *Perkins* agent were involuntary.  But, as noted, the two visits were brief and, during each, the detectives imparted only limited information about the charges and did not question defendant about his knowledge of or participation in the crimes.  Thus, that limited interaction was

insufficient to show that his subsequent statements to the agent were made involuntarily or against his free will.  Indeed, if merely informing a suspect of the charges on which he is being detained constitutes coercion, almost all statements made by suspects after such an encounter would be deemed involuntary.

C.    *Lying-in-Wait Special Circumstance*

Defendant maintains that the jury's finding on the lying-in-wait special circumstance alleged in count 1, the tagging murder of Rios, was not supported by substantial evidence.  As he views the record, "there [was] no evidence that Santos watched and waited for an opportune time to kill Rios before he began shooting him."  Instead, he concludes that although "the evidence establishe[d] beyond a reasonable doubt that Santos, [defendant], and Molina committed first degree premeditated murder because they carried out their plan to murder Rios by a surprise attack, . . . it falls short of establishing that Rios was killed by means of lying in wait."

1.    <u>Legal Principles</u>

The elements of the lying-in-wait special circumstance require (1) an intentional killing, committed under circumstances that include:  (2) a physical concealment or concealment of purpose; (3) a substantial period of watching and waiting for an opportune time to act; and, (4) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Stevens* (2007) 41 Cal.4th 182, 201 (*Stevens*).)  "The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in

41

which he acts out of rash impulse. [Citation.] This period need not continue for any particular length "'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.'" [Citation.] … The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.' [Citation.]" (*Id.* at p. 202, fn. omitted.)

2.   Analysis

When viewed in a light most favorable to the jury's finding, the evidence supported a reasonable inference that defendant, Santos, and Molina used the ruse of a tagging trip to Van Nuys to lure an unsuspecting Rios to that location, thereby concealing from Rios the true purpose of their trip. Once the group arrived at a Van Nuys neighborhood, Santos exited the car with Rios, as if to join him in tagging. But Santos did not shoot Rios immediately upon exiting the vehicle, choosing instead to watch and wait for a more opportune moment, that is, long enough for Rios to become focused on spraying graffiti while his back was to Santos. (*People v. Cage* (2015) 62 Cal.4th 256, 279 ["The lying in wait need not continue for any particular period of time provided that its duration is substantial in the sense that it shows a state of mind equivalent to premeditation or deliberation"].) Santos then shot Rios, in the back, "striking from a position of advantage and surprise." (*Stevens*, *supra*, 41 Cal.4th at p. 202.) Accordingly, the lying-in-wait special circumstance finding is supported by substantial evidence.

D.     *Pattern of Gang-Related Criminal Activity*

Defendant next contends that "the three gang conspiracies and findings on the gang-related allegations must be reversed" because they were not supported by sufficient evidence. According to defendant, "[a]lthough this was clearly a case with a mountain of gang-related evidence, the prosecutor never bothered to prove beyond a reasonable doubt the requisite pattern of criminal gang activity."

1.     <u>Legal Principles</u>

Each of the challenged convictions and enhancements required proof beyond a reasonable doubt of a pattern of criminal gang activity.

Section 186.22, subdivision (f) defines a "'criminal street gang'" as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, *a pattern of criminal gang activity*."  (Emphasis added.)

Subdivision (e) provides the requirements for demonstrating a pattern of criminal activity:  (1) the commission, attempted commission, or conspiracy to commit two or more of the offenses enumerated in that subdivision; (2) at least one of the offenses occurred after the effective date of the statute, September 26, 1988; (3) the most recent offense occurred within three years of a prior offense and three years of the current one; (4) the offenses were committed on separate occasions or by two

43

or more members; and (5) the offenses commonly benefited the gang and the benefit was more than reputational. (§ 186.22, subd. (e)(1).)

2. Analysis

To prove the requisite pattern of criminal activity, the prosecution was required to show that, on at least two or more occasions, members of Blythe Street committed, attempted to commit, or conspired to commit one of the enumerated offenses in section 186.22, subdivision (e) within the specified time frames. One of those enumerated offenses is "[t]he sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture a controlled substance as defined in Section 11007 of the Health and Safety Code." (§ 186.22, subd. (e)(1)(D).) Both heroin and methamphetamine are controlled substances under the Health and Safety Code. (Health & Saf. Code, §§ 11054, 11055.)

The evidence here showed that, while he was an active Blythe Street gang member, witness 2 would receive from Mexico large amounts of controlled substances, including methamphetamine and heroin, which he distributed and sold to fellow gang members. Members then sold the drugs for money, which the gang used to buy guns, pay taxes to the Mexican mafia, and send funds to incarcerated fellow members. During most of 2015, witness 2 was engaged in this activity with fellow Blythe Street members five days a week, that is, on separate occasions during that year, two or more members committed multiple enumerated offenses within two years of the charged offenses in this case which commonly benefited the gang in a manner that was more than reputational. That evidence was sufficient to

44

show a pattern of criminal activity by the gang from which it benefitted under section 186.22, subdivisions (e) and (f).

Defendant does not dispute these facts but suggests that further evidence was needed to carry the prosecution's burden on the requisite pattern of criminal activity. According to defendant, witness 2 was a convicted felon and the prosecution failed to provide any corroboration of his testimony or certified documents evidencing the commission of the enumerated drug crimes. But he provides no authority that such an additional showing is required to establish the necessary pattern of criminal activity. Here, the jury was aware that witness 2 was a convicted felon and nevertheless weighed and accepted his testimony as credible. (See *People v. Mumin* (2023) 15 Cal.5th 176, 202 ["'[E]ven testimony which is subject to justifiable suspicion [does] not justify the reversal of a judgment, for it is the exclusive province of the trial judge [in a court trial] or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends'"].)

Defendant also argues that because the jury was not instructed on the elements of the enumerated drug offenses, it had no basis upon which to determine whether those offenses had actually been committed by gang members. Again, defendant provides no authority that the trial court had a sua sponte duty to deliver such instructions before the matter could be submitted to the jury and the record shows that defendant did not request special instructions on the elements of the offenses at trial. The court therefore did not err in allowing the jury to consider, weigh, and assess the credibility of witness 2's admission that he distributed and sold to fellow gang members heroin and methamphetamine on multiple occasions in 2015 in deciding

45

whether the prosecution had carried its burden on the pattern of criminal activity element.

E.     *Gang Conspiracy Conviction*

Defendant argues that there was no substantial evidence to support the jury's verdict on count 10, the gang conspiracy. According to defendant, "the evidence fail[ed] to establish that [defendant] promoted, furthered, or assisted in the commission of the murder of Saldana, and other than the gang conspiracy, the jury appropriately acquitted [defendant] of all charges related to the Wendy's incident."  He alternatively argues that "the jury received a legally erroneous instruction on the elements of the gang conspiracy offense, and the error was not harmless as to count 10."

1.     <u>Sufficiency of the Evidence</u>

Before we consider defendant's challenge to the jury instruction, we will address defendant's related argument that the jury's guilty verdict on count 10 was not supported by substantial evidence.  In his statement to the *Perkins* agent, Santos claimed that during the initial portion of the confrontation with the Columbus Street members in Blythe territory, he was in communication with defendant by walkie talkie, suggesting that they were in separate cars at the time. Santos also claimed defendant was armed with an automatic rifle equipped with a scope.  As the Columbus Street members entered Blythe Street territory shouting insults from their car, Santos was on the walkie talkie with defendant who volunteered to "take them out" immediately.  According to Santos, he persuaded

46

defendant that they should instead wait for a more advantageous setting. Accompanied by other Blythe Street members, they then proceeded to follow the Columbus Street members until their car entered a Wendy's drive-thru, at which point, he and defendant shot at them from across the street. Further, defendant's own statements to the *Perkins* agent corroborated key parts of Santos's description of the events. Defendant told the agent that the Columbus Street members crashed into a Wendy's after they "got caught slipping," that is, without guns, in Blythe Street territory. The evidence at trial was thus sufficient for the jury to find that defendant actively participated in the events leading up to the murder of Saldana by agreeing with fellow Blythe Street members to follow the Columbus Street members and wait for a more opportune time to shoot at them.

### 2. Jury Instruction Error

The trial court instructed the jury on count 10 as follows: "The defendant is charged in [c]ounts 2, 10, 14, 19, 23, and 27[19] with participating in a criminal street gang conspiracy, in violation of … section 182.5. As to [c]ounts 2, 10, 19, 23, and 27, it is charged that the felony committed was murder, in violation of … section 187[, subdivision ](a)…. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant was an active participant in a criminal street gang; [¶] 2. The defendant had knowledge that its members engage in or have engaged in a pattern of criminal gang activity; [¶] 3. The crime of murder, in violation of … section 187, … was committed by the gang in which the defendant belongs; and [¶]

---

[19] Defendant was not charged in counts 19, 23, and 27.

47

4. The defendant *intended to* promote, further, assist, or benefit in the commission of the crime by other gang members." (Italics added.) In delivering this instruction, the court failed to advise the jury that it must find defendant *in fact* promoted, furthered, assisted, or benefitted in the commission of the crime and did not just *intend* to do so. (*People v. Abbate* (2020) 58 Cal.App.5th 100, 110.) The Attorney General concedes the error but maintains the error was harmless. We accept the concession but disagree that the error was harmless.

Although, as we explain above, the evidence was sufficient to support the conviction, it was far from overwhelming. Indeed, the jury found defendant not guilty on the substantive counts associated with the Wendy's murder and attempted murders, namely, counts 5 through 9 and 11, which supports the conclusion that the evidence of defendant's participation in the Wendy's murder was not strong. Indeed, the jury concluded that the prosecution had not proven beyond a reasonable doubt that defendant shot or possessed a firearm during the incident and intended to murder anyone in the Columbus Street car.

The prosecutor's argument to the jury further undermines any finding of harmlessness. (See *People v. Young* (2005) 34 Cal.4th 1149, 1202 ["The reviewing court … must consider the arguments of counsel in assessing the probable impact of the instruction on the jury"].) In discussing the conspiracy charges under section 182.5, the prosecutor referred to the erroneous fourth element of the instruction, telling the jury: "And this is the most important element, the fourth element is that they either intended to further[,] to promote, [or] further assist in the commission of crimes of other gang members."

48

On this record, we cannot conclude that the instructional error was harmless. We will therefore vacate the conviction on count 10 and remand the matter to the trial court to allow the prosecution an opportunity to retry count 10. (See *People v. Cooper* (2023) 14 Cal.5th 735, 746–747; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480; *People v. Lopez* (2021) 73 Cal.App.5th 327, 346.)[20]

F.     *Self-Defense and Voluntary Manslaughter* (Counts 13–14)

On counts 13 and 14, defendant was convicted of the attempted premeditated murder of Pena on Burnet Avenue and engaging in a gang conspiracy to commit that attempted murder. As to those counts, he argues that "the trial court erred by failing to instruct on self-defense and on voluntary manslaughter based on imperfect self-defense as a lesser included offense of attempted murder in count 13 …." As he reads the record, "there was substantial evidence to support the instructions," even if defendants were "the initial aggressors," as long as they did not "employ[] or attempt[] to employ deadly force" before shots were fired at them.

1.     Background

During the jury instruction conference, defendant's counsel asked for an instruction on self-defense using CALCRIM No. 505

_____

[20]     Because we vacate the conviction on count 10 and remand the matter for further proceedings, we do not consider the merits of defendant's challenges to his sentence or the abstract of judgment as his arguments can be raised with the trial court on remand.

49

and joined in a request by Santos's counsel for an instruction on imperfect self-defense.

On the self-defense instruction, defendant's counsel argued that the video evidence showed defendant and Santos "walk into the building but did not show them shoot anybody.  [¶]  Five seconds later, it show[ed] them running away.  I know there were .40 caliber shells found at the scene, but I believe—based on [witness 1]'s testimony, I believe it's reasonable that a jury could infer they walked into the building and they were shot at and had to return fire."

On the imperfect self-defense instruction, Santos's counsel argued "[s]o Santos … would request the self-defense instruction and an imperfect self-defense instruction based on the case law. [¶]  Additionally, it does appear they may have walked into an ambush because there is evidence that the occupants of the apartment building were firing at them.  [¶]  Allegedly, if [defendant] was there—which I'm not conceding—he supposedly dropped his gun out of fear and ran for his life and dropped his hat, assuming that person is him.  So it appears that there is evidence of self-defense or imperfect self-defense.  [¶]  Imperfect self-defense can be based on objectively, unreasonable apprehension of fear and danger.  However, that instruction, you're still entitled to it."

The trial court denied the requests for the jury instructions.

2.      Legal Principles

a.      Self-Defense

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily

50

injury, is a complete justification, and such a killing is not a crime. [Citations.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133–134.) For an act to qualify as self-defense, a defendant "'must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) Any right of self-defense is limited to such force as is "'reasonable under the circumstances.'" (*Id.* at p. 1065.) "[A]lthough the test is objective, reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might "'expect[] to operate on [the defendant's] mind ….'" [Citation.]' [Citation.]" (*Ibid.*)

A trial court is not required to give an instruction on self-defense upon request, unless there is substantial evidence to support it. (*People v. Stitely* (2005) 35 Cal.4th 514, 551.) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt …." [Citations.]' [Citations.]" (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

> b.     Voluntary Manslaughter

"'Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of … voluntary manslaughter. (§ 192.)' [Citation.] Generally, the intent to unlawfully kill constitutes malice. (§ 188 ….) 'But a defendant who intentionally and unlawfully kills lacks malice … in limited, explicitly defined circumstances:

51

either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 153–154, fn. omitted (*Breverman*) disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

An instruction on involuntary manslaughter as a lesser included offense of murder is required whenever there is substantial evidence defendant acted without malice. (*People v. Abilez* (2007) 41 Cal.4th 472, 515.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman, supra*, 19 Cal.4th at p. 162.) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. [Citations.]" (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "'In assessing the sufficiency of the evidence to support the instruction, 'we view the evidence in the light most favorable to the defendant.' [Citation.]" (*In re Hampton* (2020) 48 Cal.App.5th 463, 480.)

3.     Analysis

The testimony describing and the video depicting the Burnet Avenue shooting did not support an instruction on either self-defense or voluntary manslaughter.  Witness 1 explained that defendant and Santos traveled to rival gang territory with firearms, "looking for Columbus guys."  Pena told an officer at the hospital after the shooting that he and Ortiz[21] were standing on the street smoking when two Hispanic men approached them and began to shoot.

Defendant cites to the following portions of witness 1's testimony in support of his contention that there was substantial evidence for his requested instructions.  According to witness 1, at first, defendant and Santos could not locate any of their rivals, but "then [defendant and Santos] found some so they chased [the Columbus guys] into a building.  *They were shooting at them.* They were shooting at [Santos], and [defendant] was shooting at the guy from Columbus.  [¶]  But *after … a couple seconds, they started getting shot back*, so they jumped a fence …."  (Emphasis added.)

We disagree with defendant's characterization of that testimony, which, read in the context of the other evidence, supported only one reasonable inference—defendant and Santos admittedly went into Columbus Street territory intending to find

_____

[21]     Ortiz, who claimed not to remember much about the shooting, confirmed that he was standing next to Pena when he was shot.  When asked whether Pena had a gun, Ortiz replied, "*Nope.  No.*  I didn't see nothing.  Like I told you, he got hit and that was it, man, you know.  That's it.  Next thing I know, trying to save his life.  Other than that, I don't remember nothing, man."  (Emphasis added.)

53

and shoot Columbus Street gang members; and, when they found targets, they began shooting at them. Witness 1 explained that, after a few seconds, defendant and Santos started getting "shot back," testimony which strongly supported the inference that the Columbus Street members returned fire, but only after they were fired upon by the brothers. Although the return fire may have happened quickly, causing defendant and Santos to retreat and flee the scene, that testimony was insufficient to support either self-defense or voluntary manslaughter.

Defendant also suggests that Castillo's flight from officers at the scene, the handgun and ammunition recovered from his nearby apartment, the bullet holes in the apartment building and adjacent fence, and the spent .40 caliber casings left at the scene serve to corroborate that Columbus Street members initiated the exchange of gun fire. We disagree. It was undisputed that someone returned defendant and Santos's fire, but neither Castillo's flight nor the evidence recovered from his apartment constituted substantial evidence that Columbus gang members shot at defendant and Santos first, thus provoking their return fire. Moreover, the 12 spent .40 caliber shell casings were tested and determined to have been shot from the gun recovered from defendant's car.

## V.   DISPOSITION

The conviction on count 10 is vacated and the matter is remanded to the trial court to allow the prosecution to retry defendant on that count and, if necessary, conduct further sentencing proceedings.

In all other respects, the judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

HOFFSTADT, P. J.

BAKER, J.